## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK
### CENTRAL ISLIP

| | |
|---|---|
| SABIR MANDIL, and LINDA ESPERANZA, individually and on behalf of all others similarly situated, | 2:24-cv-04107 |
| Plaintiffs, | |
| - against - | Class Action Complaint |
| RICOLA USA INC., | |
| Defendant | Jury Trial Demanded |

Sabir Mandil ("Plaintiff Mandil"), and Linda Esperanza ("Plaintiff Esperanza") ("Plaintiffs"), through Counsel allege upon information and belief, except for allegations about Plaintiffs, which are based on personal knowledge:

## I.    IMPORTANCE OF AUTHENTICITY TO CONSUMERS

1.    For a growing number of consumers, authenticity is a key factor in making quick purchasing decisions.[1]

2.    Such products valued by consumers for their connection to specific places include whisky from Scotland, sake from Japan, and tomatoes from Italy.

3.    Reasons include (1) an expectation that a product made in the location where it was first developed or perfected will be of higher quality and value, due to expertise and local knowledge, and (2) a desire to support and maintain local

---

[1] Zane Radcliffe, Story Time: The importance of Authentic Provenance for Food and Drink Brands, The Drum Network, May 28, 2015.

traditions and cultures at the expense of commoditized products.

4.      Studies have found that consumers will pay more money for what they perceive to be authentic products linked to a specific place.

5.      Authenticity is increasingly important in the context of herbal and botanical ingredients, where factors such as soil, temperature, farming, labor, elevation, and local knowledge, assure consumers of the quality of what they are buying.[2]

6.      Switzerland is at the forefront of this trend, because its specialization in herbal ingredients dates to the Middle Ages.

7.      Its monasteries, run by the Benedictines, drew on the ancient botany teachings of the Greeks and Romans in caring for the sick, before modern medicine.

8.      Geography left the Swiss little choice to use what they could grow in their gardens and fields, since the rugged, mountainous terrain made transport outside of villages challenging.[3]

9.      These gardens were a "veritable laboratory of healing herbs," cultivated by generations, in secret.[4]

---

[2]    Josef A. Brinckmann, "Geographical Indications for Medicinal Plants: Globalization, Climate Change, Quality and Market Implications For Geo-Authentic Botanicals," World Journal of Traditional Chinese Medicine, 1.1 (2015): 16-23.

[3] Valais Wallis Promotion, The Power of Alpine Herbs.

[4]    Federal Office for Culture Herbal Knowledge in the Convents Of Central Switzerland, Living Traditions in Switzerland.



10.    The sisters of Swiss convents continue this work, cultivating and harvesting the same herbal ingredients, in the same ways, as in the Middle Ages.





11.    This history of herbal medicines was told in Das Grosse Kraüterheilbuch,

by Swiss priest Johann Künzle, who instructed readers to use what they grow in their gardens to "heal ailments from diabetes to flu."[5]

12.    According to Greg Abbott, a former botanist at Geneva's Jardin Botanique, "The Swiss are famously self-sufficient, so the culture of growing and making their own medical treatments plays right into that mindset."

13.    Today, the Swiss people take pride in the "treasure troves of healing herbs and medicinal plants grown in [their] home gardens – a veritable pharmacy in [their] front yard[s]."[6]



14.    These herbal ingredients are essential to local teas, foods, and healing products, which contribute to the country's higher than average life expectancies.

15.    Historical knowledge and tradition with herbal ingredients is a reason

---

[5] Jennifer Liu, Swiss Gardens: A Pharmacy in One's Backyard, The Swiss Times, Apr. 22, 2022.
[6] Paige Baschuk, In the Land of Pharma, Why the Swiss Turn to Natural Meds, The Swiss Times, Feb. 9, 2022.

Switzerland is home to more than forty of the world's largest pharmaceutical companies, accounting for half of its exports.

16.    Despite the country's leadership in pharmacology, the Swiss people have not forgotten their heritage.

17.    This was confirmed by a recent referendum, allowing use of herbal ingredients to treat common ailments.[7]

18.    In this regard, the Swiss are at the forefront of a global trend.

19.    According to consumer research firm Mintel, the market for therapeutic products based on herbal ingredients is over $10 billion per year and growing.

20.    Almost one hundred years ago, in response to companies that promoted the quality of their products through references to specific places associated with such items, i.e., "Florida Oranges," and "Idaho Potatoes," but grown elsewhere, the Federal Food, Drug and Cosmetic Act ("FFDCA") required "honesty and fair dealing" to truthfully inform consumers about what they were buying. 21 U.S.C. § 301 *et seq.*; 21 C.F.R. Parts 200 and 300.

---

[7] Dal Cero M, Saller R, Weckerle CS, Herbalists of Today's Switzerland and Their Plant Knowledge. A Preliminary Analysis from an Ethnobotanical Perspective. Forsch Komplementmed. 2015;22(4):238-45. doi: 10.1159/000438809. Epub 2015 Aug 17. PMID: 26566214; SD Klein et al., "Usage of Complementary Medicine in Switzerland: Results of the Swiss Health Survey 2012 and Development Since 2007," PLoS One. 2015 Oct 29; 10(10):e0141985. doi: 10.1371/journal.pone.0141985. Erratum in: PLoS One. 2015; 10(12):e0144676. PMID: 26513370; PMCID: PMC4626041.

21.   New York adopted these federal requirements through its Education Law ("EDN"). *See* EDN, Title 8, Article 137 – Pharmacy, § 6800 *et seq.*; EDN § 6802(13) (requiring compliance with identical federal statutes and regulations); Title 8, New York Codes, Rules, and Regulations ("NYCRR") § 29.7(a)(16)(ii) (defining "misbranded" in relation to OTC products that "fail[] to meet standards for purity, potency, labeling, safety and effectiveness established under" federal laws).

22.   The newly established Food and Drug Administration ("FDA") recognized "consumers initially [] rely on extrinsic cues such as visual information on labels and packaging" and developed rules to ensure over-the-counter ("OTC") products were not promoted deceptively.[8]

23.   To appeal to consumers who value authenticity and products associated with places known for quality, Ricola USA Inc. ("Defendant") sells "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral

---

[8] Lancelot Miltgen et al., "Communicating Sensory Attributes and Innovation through Food Product Labeling," Journal of Food Products Marketing, 22.2 (2016): 219-239; Helena Blackmore et al., "A Taste of Things to Come: The Effect of Extrinsic and Intrinsic Cues on Perceived Properties of Beer Mediated by Expectations," Food Quality and Preference, 94 (2021): 104326; Okamoto and Ippeita, "Extrinsic Information Influences Taste and Flavor Perception: A Review from Psychological and Neuroimaging Perspectives," Seminars in Cell & Developmental Biology, 24.3, Academic Press, 2013.

Anesthetic."



24.    The Product is "misbranded" and misleading to consumers because despite its labeling as "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," its efficacy is not derived from herbal ingredients grown in the Alps of Switzerland, but menthol, 5-Methyl-2-(propan-2-yl)cyclohexan-1-ol, is a monoterpenoid known for its cooling properties,

from crops that have a high likelihood of being grown far from the Swiss Alps. EDN § 6815(2)(a); 21 U.S.C. § 352(a)(1) (defining "misbranded" where an OTC product's "labeling is false or misleading in any particular.").[9]

25.   The "covalent organic compound" of menthol "Form[s] [as a] clear or white waxy, crystalline substance…[and] is typically solid at room temperature."[10]

26.   The menthol molecule exists as one pure stereoisomer, but has "three stereogenic centers, leading to other isomers known as isomenthol, neomenthol, and isoneomenthol."[11]

27.   Menthol "induces a cooling sensation…by stimulating the cold-sensitive receptors."

---

[9] "Misbranded" is the statutory term for labeling that is false and/or misleading.

[10] National Center for Biotechnology Information, PubChem Compound Summary for CID 16666, l-Menthol.

[11] American Chemical Society ("ACS"), (–)-Menthol, Molecule of the Week, Dec. 26, 2016.

28.   The use of this compound is revealed, in part, through the fine print on the back of the package, where it is identified as the "Active Ingredient (in each drop)," with its "Purposes" described as a "Cough suppressant [and] Oral anesthetic."



29.   As the Product's active ingredient, menthol is the "component that is intended to furnish [its] pharmacological activity or other direct effect in the diagnosis, cure, mitigation, treatment, or prevention of disease, or to affect the structure or any function of the body." 21 C.F.R. § 201.66(c)(2).

30.   In contrast, the "Swiss Alpine Herbs," promoted on the front as the source of the Product's "Cough suppressant [and] Oral anesthetic" properties, are "Inactive Ingredients," comprising the "Ricola herb mixture" of elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, and sage. 21 C.F.R. § 210.3(b)(8).

31.   These are defined as components of the Product other than its sole active ingredient of menthol. 21 C.F.R. § 210.3(b)(8).

32.   While "inactive ingredients" may not always be "inert," their effects are understood as limited to causing negative interactions with other medications, instead of acting on the condition sought to be addressed.

33.   Upon information and belief, and/or investigation of Counsel, there is a high likelihood that the active ingredient of menthol does not originate in the Swiss Alps.

34.   First, Defendant's website highlights its "Growing Regions," and how "[its] herbs grow at sites in Valais, Emmental, Val Poschiavo, the southern foothills of the Jura mountains and Central Switzerland."[12]

---

[12] Growing Regions, Ricola.



GROWING REGIONS

*Our herbs grow at sites in Valais, Emmental, Val Poschiavo, the southern foothills of the Jura mountains and Central Switzerland. Over one hundred highly experienced herb farmers attend to the small plants that thrive in the soil types that are unique to the Swiss mountains. This is where the energy in every Ricola sweet comes from.*

35.    Further review reveals these are the "the 10 herbs used to create the special Ricola mixture," and the "core of [the Product]," "elder, horehound, hyssop, lemon balm, linden flowers, mallow, peppermint, sage, thyme, and wild thyme," which are part of the Product's inactive ingredients.[13]

Emil Richterich sourced the 10 herbs used to create the special Ricola mixture from the Laufental District, now home to the company's headquarters. The master baker may also have been inspired by the weird and wonderful names of some of the herbs and the special qualities they are said to have. The exact recipe remains a secret today.



10-herb mixture

---

[13] Herb Mixture, Ricola.



36.   The footer on each page highlights the components of the "10 Swiss Herbs," "Elder, Horehound, Hyssop, Lemon Balm, Linden Flowers, Mallow, Peppermint, Sage, Thyme, [and] Wild Thyme," with separate pages corresponding to each.



37.   Second, Defendant's website describes how it sorts and then mixes the

ten herb mixture.[14]



38.    Based on an interview with Defendant's employees posted on LinkedIn, "The raw materials are then dissolved in water, brought to boiling, and mixed with the other ingredients."[15]

39.    This is consistent with another report describing how "large amounts of herbs are boiled to form a concentrated extract…[which] is mixed and heated to form a hot substance that can be molded."[16]

40.    Defendant's Media Kit indicates that it "adds other ingredients" before the "drop mass is [] cooked."[17]

41.    Third, numerous publicly available photographs show the interior of

---

[14] Processing, Ricola.
[15] Mettler Toledo Laboratory Solutions, A Swiss Mountain Weighed in a Drop, LinkedIn, Jan. 17, 2024.
[16] Tony Ganzer, Ricola's (herbal) Flavor Makers, Oct. 6, 2010.
[17] Ricola, Media Kit at 18, Aug. 2021.

Defendant's facilities.

42.   This includes how it "[P]our[s] the 'batter' of [the] cough drops" prior to it being shaped and cut, before packaging.[18]





43.   Third, nowhere in any publicly available information and photos does Defendant describe how it procures or manufactures the Product's active ingredient of menthol.

---

[18] Tony Ganzer, Ricola's (herbal) Flavor Makers, Oct. 6, 2010.

44.   While its website discusses peppermint, or *Mentha piperita*, as "contain[ing] menthol, a unique ingredient that provides a cooling sensation to help soothe coughs and sore throats," this compound is not obtained by combining it with other herbal ingredients, and concentrating them.[19]



NATURE'S SOOTHER

*An aromatic plant with lovely lavender flowers and rich green leaves, Peppermint grows throughout North America, Asia and Europe. It also contains menthol, a unique ingredient that provides a cooling sensation to help soothe coughs and sore throats. Making Peppermint one very useful herb.*

45.   Menthol is obtained by "Steam distillation [,] the conventional means by which oils are extracted…[and] the most widely accepted process for distilling oils on a large scale."[20]

46.   This entails "passing dry steam through the plant material, whereby the steam volatile compounds are volatilized, condensed, and collected in receivers."

---

[19] Peppermint, Our 10 Swiss Herbs.

[20] Maharaj, Sharad, and David McGaw. "Mathematical model for the removal of essential oil constituents during steam distillation extraction." Processes 8.4 (2020): 400.



47.    Then, "vapors exiting the extraction chamber are [] condensed into oil and water [where] [T]he extracted oil floats on the aqueous extract and [is] [] collected when cooled."

48.    The application of steam "causes the separation of a mixture into its component parts, or fractions." known as fractional distillation.[21]

49.    Steam extraction requires large-scale fractional distillation units, normally found in rural areas of developing countries.



---

[21]    Wikipedia contributors. "Fractional distillation." Wikipedia, The Free Encyclopedia. Wikipedia, The Free Encyclopedia, Apr. 6, 2024.

50. Lastly, "all commercially available l-menthol production involves a last crystallization step," where "[T]he resulting oil is then cooled," in industrial refrigeration rooms.[22]



51. The crystals are then purified to ensure their potency.



52. Fourth, commercial usage of menthol does not involve using an entire

---

[22] George S. Clark, "Menthol: An Aroma Chemical Profile," Perfumer & Flavorist, 20 (1995): 41-44; Duskiveron, What is crystal menthol, Medium, Sept. 17, 2023.

mint leaf or mint plant, whether peppermint or other varieties.

53.  Instead, mint's value is due to its essential oils, which generally include menthol, menthone, isomenthone, menthofuran, menthyl acetate, pulegone, 1,8-cineole, and limonene.[23]

| menthol | menthone | isomenthone | menthofuran |

| menthyl acetate | pulegone | 1,8-cineole | limonene |

54.  Of these, "[M]enthol is the most important constituent, which [provides] the herb its pharmacological properties."[24]

55.  According to Clark, the "Two essential oils [that] are [most] rich in l-menthol content [are] cornmint oil (*Mentha arvensis*)…and peppermint oil (*Mentha*

---

[23] Kalemba D, Synowiec A. Agrobiological Interactions of Essential Oils of Two Menthol Mints: Mentha piperita and Mentha arvensis. Molecules. 2019 Dec 23;25(1):59; Beigi, M., Torki-Harchegani, M., & Ghasemi Pirbalouti, A. (2018). Quantity and chemical composition of essential oil of peppermint (Mentha × piperita L.) leaves under different drying methods. International Journal of Food Properties, 21(1), 267-276.

[24] Mint & Peppermint, Organic Pharma.

*piperita*).”[25]

56.   However, the menthol content of corn mint is between 75 and 80 percent, which is close to double what can be obtained from peppermint, at 40 percent.[26]

57.   Moreover, “The high cost of *Mentha piperita* and the difficulty of crystallizing significant quantities of menthol makes [it] an impractical commercial source.”

58.   Fifth, based on the challenges and cost of obtaining menthol from peppermint, Clark and other experts recognize that “the sole source of the world’s supply of commercially available natural l-menthol is plantations of numerous subspecieis of *Mentha arvensis* plants grown mainly in India and China.”[27]

59.   Another scholar confirmed that “Although not generally commercially available, menthol produced from M. piperita oil has a sweeter peppermint top note than that produced from cornmint oil.”

60.   Moreover, “skilled technician[s] can add a small percentage (e.g., 0.2–

---

[25] George S. Clark, “Menthol: An Aroma Chemical Profile,” Perfumer & Flavorist, 20 (1995): 41-44.

[26] Mint, National Horticulture Board (“NHB”) of India; Schmidt, Erich, et al. "Chemical composition, olfactory evaluation and antioxidant effects of essential oil from Mentha x piperita." Natural product communications 4.8 (2009): 1934578X0900400819; Maryann Readal, Peppermint, Herb of the Month, Herb Society of America.

[27] Srivastava, R. K., et al. "Characteristics of menthol mint Mentha arvensis cultivated on industrial scale in the Indo-Gangetic plains." Industrial crops and products 15.3 (2002): 189-198 (recognizing that corn mint, or *Mentha arvensis*, “is the source of commercial natural menthol.”).

0.4%) of terpeneless peppermint oil ex M. piperita (or redistilled dementholized cornmint oil), which adds the desirable sweet peppermint top note," to menthol from cornmint.

61.   Data from the National Horticulture Board ("NHB") of India support this conclusion, as the total production of oils from peppermint is one-quarter of what is obtained from cornmint.[28]

| Species | Area (ha.) | Production (tonnes of Oil) | Total world production (tonnes of Oil)) | Major Producing Countries |
|---|---|---|---|---|
| Japanese mint | 60,000 | 12,000 | 16,000 | India, China, Brazil |
| Peppermint | 2,500 | 200 | 4,000 | USA, France, former USSR, Brazil, India |
| Bergamot mint | 1,200 | 150 | 200 | USA, Brazil, Thailand |
| Spearmint | 3,000 | 300 | 2,000 | USA, China, former USSR, India |

Source: Essential Oils Association of India (2001), Vision 2005

62.   Relying on Clark's data, mint expert John C. Leffingwell estimated that India supplied at least three-quarters of the world's natural menthol.[29]

**Table 1**   Worldwide Sources of Menthol (2007)

| Source | Metric ton |
|---|---|
| India (natural) | 9,700 |
| China (natural) | 2,120 |
| Symrise (synthetic) | 3,600 |
| Takasago (synthetic) | 1,500 |
| Other synthetic[a] | 1,200 |
| Brazil (natural)[b] | 450 |
| Taiwan (natural)[b] | 300 |
| Japan (natural)[b] | 300 |
| Total[c] | 19,170 |

[a]Other synthetic includes menthol produced from menthone as well as racemic menthol.
[b]Primarily from *Mentha arvensis* oil or crude menthol ex India (or China).
[c]Total menthol volume based on Clark's estimate (4).

---

[28] Mint, National Horticulture Board ("NHB") of India.
[29] John C. Leffingwell, "65 Cooling Ingredients and Their Mechanism of Action," in Cosmetic Science and Technology (2009): 661.

63.    Currently, "India is the world leader in the production and export of mint oil and its products, with an approx capacity of 40,000 tons [with] its contributing share [] at 80-85% of world production."[30]

64.    Mint "is cultivated in large areas of the Indo-Gangetic plains of Uttar Pradesh, Punjab, Haryana, and Bihar."



65.    Sixth, the dominance of India in mint production is confirmed by global trade data based on Harmonized System ("HS") codes, which categorize shipments in global trade.

66.    Where menthol is intended for use in pharmaceuticals and OTC products, Pankaj Somani of the New Delhi-based Agson Global confirms it "can be found under HS Code 30039021," which is "the crystal form used by pharmaceutical

---

[30] Dr. Manoj Semwal, Principal Scientist, From Importing Menthol to Becoming a Leading Exporter, Counsel of Scientific & Industrial Research ("CSIR").

companies."[31]

67.    If menthol is intended "for human consumption it is exported under HS Code 29061100."

68.    Global export data from leading aggregator Volza identified "The top 3 exporters of Menthol crystal [as] India with 13,487 shipments followed by China with 1,701 and Singapore at the 3rd spot with 346 shipments."[32]

- As per Volza's Global Export data, Menthol crystal export shipments stood from World at 16.9K, exported by 1,290 World Exporters to 3,207 Buyers.
- World exports most of it's Menthol crystal to United States, Netherlands and Indonesia
- The top 3 exporters of Menthol crystal are India with 13,487 shipments followed by China with 1,701 and Singapore at the 3rd spot with 346 shipments.
- Top 3 Product Categories of Menthol crystal in World are
  1. HSN Code 30039021 : 30039021
  2. HSN Code 29061110000 : 29061110000
  3. HSN Code 29061100 : 29061100

These facts are updated till 1 Dec 2023, and are based on Volza's Export Import data of Menthol crystal, sourced from 70 countries export import shipments with names of buyers, suppliers, top decision maker's contact information like phone, email and LinkedIn profiles.

69.    This trade data revealed that "Switzerland imports most of its Menthol crystal from India," with "import shipments [] at 46, imported by 10 Switzerland Importers from 7 Suppliers."[33]

- As per Volza's Switzerland Import data, Menthol crystal import shipments in Switzerland stood at 46, imported by 10 Switzerland Importers from 7 Suppliers.
- Switzerland imports most of its Menthol crystal from India .
- The top 3 importers of Menthol crystal are United States with 3,049 shipments followed by Netherlands with 1,002 and Indonesia at the 3rd spot with 930 shipments.
- Top 3 Product Categories of Menthol crystal Imports in Switzerland are
  1. HSN Code 30039021 : 30039021
  2. HSN Code 29061100 : 29061100
  3. HSN Code 30039090 : 30039090

These facts are updated till 18 Dec 2023, and are based on Volza's Switzerland Import data Switzerland Import data of Menthol crystal sourced from 70 countries export import shipments with names of buyers, suppliers, top Decision maker's contact information like Direct, phone, email and LinkedIn profiles.

---

[31] Anishaa Kumar, How About 'Mint'ing Some Money?, The Dollar Business, Jan. 2018.
[32] Menthol crystal exports from World, Volza.
[33] Menthol Imports, Imports in Switzerland, Volza.

70.   Sixth, though Switzerland, and Defendant, grow small amounts of herbs, including mint, "Cultivation in Switzerland is rather expensive and not competitive to other countries," owing to labor-intensive harvesting, lower value relative to other crops and land usage types, and a significantly smaller geographic area.[34]

<div style="margin-left:2em">

**Switzerland**
- Cultivation in Switzerland is rather expensive and not competitive to other countries
- Some areas are supported by companies like Ricola and Rausch for marketing purposes
- Pioneer in medicines' production out of herbs is Zeller
- Innovations by companies giving a commitment to their Swiss origin (high-price segment)
- Small amounts → unprofitably

</div>

71.   In fact, a Report from the Interreg Alpine Space program even claimed that "Some [herbal growing] areas are supported by companies like Ricola and Rausch for marketing purposes."

72.   The Product's labeling, "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," is misleading because it "includes [] [Swiss Alpine Herbs] but not [menthol] even though [this] [is] stated elsewhere in the labeling," on the fine print of the back of the package. 21

---

[34] Manuela Burkert and Tobias Chilla, Market Potential Analysis for Regional Products in the Alpine Space: WP T1: Value Chain Analysis – Walnuts and Herbs, Interreg Alpine Space, Kompetenzzentrum für Ernährung, 81 (2019).

C.F.R. § 201.6(b); 8 N.Y.C.R.R. § 29.7(a)(16)(ii).

73.     The Product's labeling, "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," is misleading because this "fanciful proprietary name" is used "to imply [it] has some unique effectiveness or composition when, in fact, [it] is a common substance [a menthol lozenge]." 21 C.F.R. 201.10(c)(3); 8 N.Y.C.R.R. § 29.7(a)(16)(ii).

74.     This principle was part of the Federal Trade Commission's ("FTC") Proposed Guides for Advertising Over-the-Counter Drugs.

75.     The FTC cautioned companies against implying that an OTC product's ingredients "has some novel or unique effectiveness or composition, when in-fact the drug or ingredient is a common substance (e.g., aspirin, caffeine) which would be readily recognized by the public if the drug or ingredient were designated by its common or usual or established name."

76.     The Product's labeling, "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," is misleading by "featuring in the labeling of inert or inactive ingredients in a manner that creates

an impression of value greater than their true functional role in the formulation." 21 C.F.R. 201.10(c)(4); 8 N.Y.C.R.R. § 29.7(a)(16)(ii).

77.    The Product's labeling, "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," causes consumers to expect its efficacy is derived from these "Swiss Alpine Herbs," even though (1) its active ingredient is not an herbal ingredient in the manner understood by consumers, because it is a compound extracted and refined, from an herb, (2) its active ingredient is not from the Swiss Alps, but the Indian plains, and/or (3) none of the Swiss Alpine Herbs depicted on the front label provide any therapeutic benefit, since they are "inactive ingredients."

78.    As a result of the false and misleading representations, the Product is sold at a premium price, approximately $3.49 for 21 lozenges, and higher prices when sold in larger quantities, excluding tax and sales, higher than similar products, represented in a non-misleading way, and higher than it would be sold for absent the misleading representations and omissions.

## JURISDICTION

79.    Jurisdiction is based on the Class Action Fairness Act of 2005 ("CAFA"). 28 U.S.C. § 1332(d)(2).

80.  The aggregate amount in controversy exceeds $5 million, including any statutory or punitive damages, exclusive of interest and costs.

81.  Plaintiff Sabir Mandil is a citizen of New York.

82.  Defendant is a citizen of New Jersey based on its corporate formation.

83.  Defendant is a citizen of New Jersey based on its principal place of business.

84.  The Court has jurisdiction over Defendant because it transacts business within New York and sells the Product to consumers within New York from retail stores such as grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, other similar locations, and/or online, to citizens of this State.

85.  Defendant transacts business in New York, through the sale of the Product to citizens of New York from retail stores such as grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, other similar locations, and/or online, to citizens of this State.

86.  Defendant has committed tortious acts within this State through the distribution and sale of the Product, which is misleading to consumers in this State.

87.  Defendant has committed tortious acts outside this State by labeling,

representing and selling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, type, origins, amount and/or quality, by regularly doing or soliciting business, or engaging in other persistent courses of conduct to sell the Product to consumers in this State, and/or derives substantial revenue from the sale of the Product in this State.

88.   Defendant has committed tortious acts outside this State by labeling the Product in a manner which causes injury to consumers within this State by misleading them as to its contents, type, origins, amount and/or quality, through causing the Product to be distributed throughout this State, such that it expects or should reasonably expect such acts to have consequences in this State and derives substantial revenue from interstate or international commerce.

## VENUE

89.   Plaintiff Mandil resides in Nassau County.

90.   Venue is in this Court because a substantial or entire part of the events or omissions giving rise to Plaintiff Mandil's claims occurred in Nassau County.

91.   Venue is in this Court because Plaintiff Mandil's residence is in Nassau County.

92.   Plaintiff Mandil purchased, applied, used, and/or consumed the Product in reliance on the packaging, labeling, representations, and/or omissions identified here in Nassau County.

93.  Plaintiff Mandil first became aware the packaging, labeling, representations, and/or omissions, were false and misleading, in Nassau County.

## PARTIES

94.  Plaintiff Mandil is a citizen of Nassau County, New York.

95.  Plaintiff Esperanza is a citizen of Queens County, New York.

96.  Defendant Ricola USA Inc. is a New Jersey corporation.

97.  Defendant manufactures and sells herbal lozenges under the Ricola brand.

98.  The Product is sold in various sizes with uniform representations, omissions, labeling, and packaging.

99.  Plaintiffs are like most consumers and prefer products associated with a place known to produce that product, such as whisky from Scotland, sake from Japan, and tomatoes from Italy, because they expect such products to be of higher quality, based on history and expertise in that area.

100. Plaintiffs are like most consumers and look to the front label of therapeutic products to see what they are buying and to learn basic information about it.

101. Plaintiffs are like most consumers and are accustomed to the front label of packaging telling them what a product is, its features, and in the context of OTC products, the source of those features, i.e., its effective or active ingredients.

102. Plaintiffs are like most consumers and when they see a front label which highlights ingredients and components in connection with a location known for those ingredients and components, they expect its main and effective ingredients will be from that location.

103. Plaintiffs read, saw, and relied on the packaging and labeling of "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic."

104. Plaintiffs expected the Product's main and effective ingredients in acting as a "Cough Suppressant [and] Oral Anesthetic" would be the "Swiss Alpine Herbs," grown in Switzerland, and depicted on the front label.

105. Plaintiffs relied on the omission of how the Product's active ingredients were not "Swiss Alpine Herbs," or any herbs, but menthol, a compound isolated and obtained from herbs, not in Switzerland, but with a high likelihood being grown in India, as this related to its functionality as a "Cough Suppressant [and] Oral Anesthetic."

106. Plaintiffs did not expect that the Product's efficacy would not come from herbs grown and cultivated in Switzerland, but compounds derived and extracted from herbs, with a high likelihood being grown in India.

107. Plaintiffs bought the Product with the labeling identified here, "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," at around the above-referenced price.

108. Plaintiffs purchased the Product between May 2021 and May 2024, at grocery stores, big box stores, bodegas, gas stations, warehouse club stores, drug stores, convenience stores, specialty grocery stores, ethnic food stores, gas station convenience stores, and/or other similar locations in New York.

109. Plaintiffs paid more for the Product than they would have had they known its main and effective ingredients in acting as a "Cough Suppressant [and] Oral Anesthetic" would not be the "Swiss Alpine Herbs," grown in Switzerland, depicted on the front label, but compounds derived from herbal ingredients, with a high likelihood being grown in India, as they would not have bought it or would have paid less.

110. The Product was worth less than what Plaintiffs paid, and they would not have paid as much absent Defendant's false and misleading statements and omissions.

111. Plaintiffs chose between Defendant's Product and products represented similarly, but which did not misrepresent their attributes, features, and/or

components.

## CLASS ALLEGATIONS

112. Plaintiffs seek to represent the following class:

> All persons in New York who purchased the Product in New York during the statutes of limitations for each cause of action alleged, expecting its main and/or active ingredients would be herbs grown in Switzerland.

113. Excluded from the Class are (a) Defendant, Defendant's board members, executive-level officers, members, and attorneys, and immediate family members of any of the foregoing persons, (b) governmental entities, (c) the Court, the Court's immediate family, and Court staff and (d) any person that timely and properly excludes himself or herself from the Class.

114. Common questions of issues, law, and fact predominate and include whether Defendant's representations were and are misleading and if Plaintiffs and class members are entitled to damages.

115. Plaintiffs' claims and basis for relief are typical to other members because all were subjected to the same unfair, misleading, and deceptive representations, omissions, and actions.

116. Plaintiffs are adequate representatives because their interests do not conflict with other members.

117. No individual inquiry is necessary since the focus is only on Defendant's

practices and the class is definable and ascertainable.

118. Individual actions would risk inconsistent results, be repetitive and are impractical to justify, as the claims are modest relative to the scope of the harm.

119. The class is sufficiently numerous, with over 100 members, because the Product has been sold throughout the State for several years with the representations, omissions, packaging, and labeling identified here, at hundreds of retail locations and online to citizens of this State.

120. Plaintiffs' Counsel is competent and experienced in complex class action litigation and intends to protect class members' interests adequately and fairly.

## CAUSES OF ACTION

### COUNT I
General Business Law ("GBL") §§ 349 and 350

121. To the extent required, Plaintiffs incorporate by reference paragraphs 1-43.

122. The purpose of the GBL is to protect consumers against unfair and deceptive practices.

123. This includes making state consumer protection and enforcement consistent with established policies of federal law relating to consumer protection.

124. The GBL considers false advertising, unfair acts, and deceptive practices in the conduct of any trade or commerce to be unlawful.

125. Violations of the GBL can be based on other laws and standards related

to consumer deception.

126. Violations of the GBL can be based on the principles of the Federal Trade Commission Act ("FTC Act") and FTC decisions with respect to those principles. 15 U.S.C. § 45 *et seq*.

127. A GBL violation can occur whenever any rules promulgated pursuant to the FTC Act, 15 U.S.C. § 41 *et seq*., are violated.

128. A GBL violation can occur whenever the standards of unfairness and deception set forth and interpreted by the FTC or the federal courts relating to the FTC Act are violated.

129. A GBL violation can occur whenever any law, statute, rule, regulation, or ordinance which proscribes unfair, deceptive, or unconscionable acts or practices is violated.

130. In considering whether advertising is misleading in a material respect, the FTC Act recognizes that the effect of advertising includes not just representations made or suggested by words and images, "but also the extent to which [it] fails to reveal facts material in the light of such representations." 15 U.S.C. § 55(a)(1).

131. In considering whether a product's label is misleading, it is required to consider not only representations made or suggested by statements, images, and/or design, but also the extent to which it fails to prominently and conspicuously reveal facts relative to the proportions or absence of certain ingredients or other facts

concerning ingredients or attributes, which are of material interest to consumers.

132. Defendant's false and deceptive representations and omissions with respect to the Product's contents, origins, ingredients, type, functionality, and/or quality, that "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," meant its main and functional ingredients were herbs from Switzerland, instead of compounds derived and extracted from herbs, with a high likelihood being grown in India, are material in that they are likely to influence consumer purchasing decisions.

133. This is because consumers (1) prefer products associated with a place known for those products, because they expect them to be of higher quality, based on history and expertise in that area, and (2) prefer therapeutic products which get their benefits from entire herbal ingredients, instead of compounds derived from herbal ingredients, through complex processing methods.

134. The substitution of compounds derived from herbal ingredients, with a high likelihood being grown in India, for whole herbal ingredients, from Switzerland, as the source of the Product's efficacy, is of material interest to consumers, because the latter are of higher quality and price.

135. The labeling of the Product violated the FTC Act and thereby violated

the GBL because the representations, omissions, packaging, and labeling, "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," created the erroneous impression the Product's main and functional ingredients were herbs from Switzerland, when this was false, because its main and functional ingredient was a compound derived from herbs, with a high likelihood being grown in India.

136. The labeling of the Product violates laws, statutes, rules and regulations which proscribe unfair, deceptive, or unconscionable acts or practices, thereby violating the GBL.

137. Violations of the GBL can be based on public policy, established through statutes, law, or regulations.

138. The labeling of the Product violates laws, statutes, rules and regulations that are intended to protect the public.

139. The labeling of the Product violated the GBL because the representations, omissions, labeling, and packaging, "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic,"

when its main and functional ingredient was a compound derived from herbs, with a high likelihood being grown in India, not Switzerland, was unfair and deceptive to consumers.

140. The labeling of the Product violated the GBL because the representations, omissions, packaging, and labeling of "Original Herb Cough Drops," promoted as "Made With Swiss Alpine Herbs," identified by pictures of peppermint, elder, wild thyme, horehound, hyssop, mallow, thyme, lemon balm, linden flower, sage, for the purposes of acting as a "Cough Suppressant [and] Oral Anesthetic," when this was false, because its main and functional ingredient was a compound derived from herbs, with a high likelihood being grown in India, not Switzerland, was contrary to statutes and/or regulations below, which adopted the FFDCA and accompanying regulations, to prohibit consumer deception by companies in the labeling of OTC products.

|           Federal           |           State           |
|-----------------------------|---------------------------|
| 21 U.S.C. § 352(a)(1)       | EDN § 6815(2)(a)          |
|                             |                           |
| 21 C.F.R. § 201.6(b)        |                           |
| 21 C.F.R. § 201.10(c)(3)    | 8 N.Y.C.R.R. § 29.7(a)(16)(ii) |
| 21 C.F.R. § 201.10(c)(4)    |                           |

141. Plaintiffs believed the Product's main and effective ingredients were "Swiss Alpine Herbs," grown in Switzerland, even though its active ingredient was

a compound derived from herbs, grown not in Switzerland, but with a high likelihood being grown in India.

142. Plaintiffs paid more for the Product and would not have paid as much if they knew that the Product's main and effective ingredients were not "Swiss Alpine Herbs," grown in Switzerland, because its active ingredient was a compound derived from herbs, grown not in Switzerland, but with a high likelihood being grown in India.

143. Plaintiffs seek to recover for economic injury and/or loss they sustained based on the misleading labeling and packaging of the Product, a deceptive practice under the GBL.

144. Plaintiffs will produce evidence showing how they and consumers paid more than they would have paid for the Product, relying on Defendant's representations, omissions, packaging, and labeling, using statistical and economic analyses, hedonic regression, hedonic pricing, conjoint analysis, and/or other advanced methodologies.

145. As a result of Defendant's misrepresentations and omissions, Plaintiffs were injured and suffered damages by their payment of a price premium for the Product, which is the difference between what they paid based on its labeling, packaging, representations, statements, omissions, and/or marketing, and how much it would have been sold for without the misleading labeling, packaging,

representations, statements, omissions, and/or marketing identified here.

<u>Jury Demand and Prayer for Relief</u>

Plaintiffs demand a jury trial on all issues.

 **WHEREFORE**, Plaintiffs pray for judgment:

1. Declaring this a proper class action, certifying Plaintiffs as representatives and the undersigned as Counsel for the class;

2. Awarding monetary damages and interest;

3. Awarding costs and expenses, including reasonable fees for Plaintiffs' attorneys and experts; and

4. Other and further relief as the Court deems just and proper.

Dated:   June 8, 2024

Respectfully submitted,

/s/  Spencer Sheehan
Sheehan & Associates P.C.
60 Cuttermill Rd Ste 412
Great Neck NY 11021
Tel  (516) 268-7080
Fax (516) 234-7800
spencer@spencersheehan.com

*Notice of Lead Counsel Designation:*

*Lead Counsel for Plaintiffs*

Spencer Sheehan

Sheehan & Associates P.C.

*Counsel for Plaintiffs*

38

**Certificate of Service**

I certify that on June 8, 2024, I served and/or transmitted the foregoing by the method below to the persons or entities indicated, at their last known address of record (blank where not applicable).

|  | Electronic Filing | First-Class Mail | Email | Fax |
|---|---|---|---|---|
| Defendant's Counsel | ☐ | ☐ | ☐ | ☐ |
| Plaintiffs' Counsel | ☒ | ☐ | ☐ | ☐ |
| Court | ☒ | ☐ | ☐ | ☐ |

/s/ Spencer Sheehan